**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-02371-CMA

NATURAL RESOURCES DEFENSE COUNCIL, and
WILDERNESS WORKSHOP,

      Plaintiffs,

v.

THOMAS VILSACK, in his official capacity as the Secretary of Agriculture,
U.S. FOREST SERVICE,
ANTOINE DIXON, in his official capacity as Deputy Regional Forester, Resources,
    of the Rocky Mountain Region,
MARY MORGAN, in her official capacity as Acting Forest Supervisor for the
    White River National Forest,
KENNETH L. SALAZAR, in his official capacity as Secretary of the Department
    of the Interior, and
BUREAU OF LAND MANAGEMENT,

      Defendants,

and

OXY USA INC.,

      Intervenor-Defendant.

---

## OPINION AND ORDER AFFIRMING AGENCY ACTION

---

      This matter is before the Court on the Petition for Review of Agency Action filed

by Plaintiffs Natural Resources Defense Council and Wilderness Workshop.  (Doc.

# 28.)  In the Petition, Plaintiffs challenge final decisions by the United States Forest

Service ("Forest Service") and Bureau of Land Management ("BLM") approving a

natural gas drilling project in the White River National Forest in western Colorado.

Plaintiffs challenge the decisions only as they relate to the drilling project's effects on air quality, and specifically, ozone pollution and visibility.  The matter has been fully briefed (Doc. # 29, 33, 34), and Defendants have submitted the administrative record to the Court (Doc. # 20, 23, 25).  After carefully analyzing the briefs and the administrative record, the Court AFFIRMS the decisions of the Forest Service and BLM.

## I.  JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (review of final agency action).[1]

## II. BACKGROUND

### A.   FACTUAL BACKGROUND

In 2008, Defendants approved OXY USA Inc.'s Hells Gulch North Phase 2 natural gas development project ("the Project") in Mesa County, Colorado (just south of Silt and I-70) in the White River National Forest ("the Forest").  The Project involves the drilling of up to 45 natural gas wells, the construction of six well pads, the creation of six miles of new access roads, and a total of approximately 50 acres of new surface

---

[1] Plaintiffs' Complaint is properly construed as bringing claims only under the judicial review procedures of the APA, despite the fact that Plaintiffs allege violations of the National Environmental Policy Act ("NEPA"), National Forest Management Act ("NFMA"), Federal Land Policy and Management Act ("FLPMA"), and Clean Air Act ("CAA").  (*See* Doc. # 1, at 15-19.) First, the Complaint's statement of jurisdiction identifies the APA as the basis for jurisdiction, not the aforementioned environmental statutes.  (*See id.* at 3, ¶ 10.)  Second, as to the alleged violations of NEPA, NFMA, and FLPMA, the claims are properly construed as APA claims because NEPA, NFMA, and FLPMA do not create private rights of action.  *See Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 823 (10th Cir. 2008); *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998).  And third, as to the alleged violations of CAA, Plaintiffs have made clear that they are not pursuing a separate cause of action under CAA.  (*See* Doc. # 28 at 11 n.6.)

disturbance in the Forest.  (FS03888.)[2]  If natural gas is successfully produced from the

first well, OXY USA will be permitted to construct approximately six miles of pipeline,

and install up to 45 gas meters, up to 45 400-barrel storage tanks, and up to 13

dehydrator heater units in the Forest, for production over a 20-30 year period.  (*Id.*)

OXY USA holds an oil and gas lease entitling it to drill for natural gas on the land

at issue, subject to, *inter alia*, "reasonable measures . . . to minimize adverse impacts to

other resource values . . . ."  43 C.F.R. § 3101.1-2; *see also New Mexico ex rel.

Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (discussing

leasing process).  (*See* FS00499-506 (the lease), FS03885, FS03923, Doc. # 33 at 2.)

The Project was originally proposed to the Forest Service in 2006.  (FS00001-

38.)[3]  In January 2007, the Forest Service issued a Draft Environmental Assessment

("Draft EA"), which discussed a Proposed Action and several alternatives, and the

environmental effects of each.  (FS04165-357.)  It also provided notice to the public

and an opportunity to comment.  (FS00237-40.)  Plaintiffs, among others, submitted

comments on the Draft EA in March 2007.  (FS00264-98.)  Plaintiffs commented that,

among other issues, the Draft EA failed to analyze the Project's effects on the creation

of ozone.[4]  (FS00282.)  In April 2008, the Forest Service issued a Response, in which it

---

[2]  A cite to "FS_____" is a cite to a page or pages within the administrative record, collectively located at docket numbers 20, 23, and 25.

[3]  Laramie Energy originally held the lease and proposed the Project.  Laramie Energy later transferred its lease to Plains Exploration and Production Company, which subsequently transferred the lease to OXY USA.  (FS03885; Doc. # 33 at 2.)

[4]  "Ozone is a toxic air pollutant that is formed on warm, sunny days when its precursors nitrogen oxides (NOx) and volatile organic compounds (VOC) react in the presence of sunlight.

stated, *inter alia*, that "[s]imulation of ozone formation and transport is a highly complex exercise that . . . is left to agencies with jurisdiction over areas with ozone problems. There is no requirement for analyzing ozone impacts . . . ."  (FS00406.)

In May 2008, the Forest Service issued its final Environmental Assessment ("EA"), which discussed a Modified Proposed Action and alternatives.  (FS03912-4050.) The Modified Proposed Action consisted of the ultimate course of action described above (including the drilling up to 45 natural gas wells and construction of six well pads). (FS03928-48.)  The alternatives considered were not allowing the Project, allowing the Project at a slower rate of development, and allowing the Project as originally proposed by OXY USA.  (FS03948-53.)

The EA analyzed numerous environmental effects of the Project.  (FS03954-4013.)[5]  As part of its analysis, the Forest Service conducted two types of modeling (ISC3ST and CALPUFF) to assess the effects of the Project on air quality.  (FS03962-63.)  The EA concluded,

> Implementation of the Modified Proposed Action . . . would result in increased air emissions in the project area.  Short-term emissions would primarily be fugitive dust from construction and traffic and NOx from diesel powered vehicles and equipment.  Long-term emissions would primarily be NOx [and two other pollutants]. . . .

---

Because ozone is a regional pollutant, precursor sources both near and far from [federal lands] can contribute to ozone formation.  High ozone exposure can harm human health [and vegetation]."  (FS05383.)

[5]  Because Plaintiffs challenge Defendants' decisions only as they pertain to air quality, the Court will limit its discussion to that subject.

4

Individually the [Project] would not result in an exceedance of [National Ambient Air Quality Standards ("NAAQS")],[6] [or] Class I visibility thresholds . . . .  However, [the modeling analyses] indicate[] substantial adverse air quality effects to Class I/II areas collectively from current and future emissions sources in comparison to assumed natural visibility background . . . .  These impacts are primarily due to emissions from power plants but also include emissions from oil and gas exploration and development as well as from a variety of mining and mineral-processing operations.

The results of [the modeling] underscore the importance of interagency cooperation in mitigating substantial air quality effects from current and future emission sources.  The [Colorado Department of Public Health and Environment's Air Pollution Control Division ("APCD")] has the authority and responsibility to manage and control existing air pollution sources.  The Forest Service is working with the APCD through the Regional Haze State Implementation Process . . . to manage and protect air quality in Class I areas.

(FS03925, FS03972.)  In terms of ozone pollution, the EA discussed the Project's

emissions of ozone's precursors, NOx and VOCs, and stated that "[e]levated

concentrations of [NOx and VOCs] can . . . contribute to the formation of ground level

ozone."  (FS03956.)  The EA also listed ozone as a "criteria pollutant" under the

NAAQS.  (FS03958.)  Otherwise, the EA did not specifically discuss the Project's effects

on the creation of ozone.

The Forest Service subsequently issued its Decision Notice and Finding of No

Significant Impact ("FONSI"), in which it approved the Modified Proposed Action as

---

[6] Under the Clean Air Act, the United States Environmental Protection Agency ("EPA") "promulgate[s] primary and secondary national ambient air quality standards (NAAQS) for [certain] pollutants."  *Alaska Dep't of Envtl. Conservation v. Envtl. Prot. Agency*, 540 U.S. 461, 469 (2004) (citation and internal quotation marks omitted).  The EPA has created NAAQS for ozone.  (FS05383.)

presented in the EA.  (FS03884-911.)[7]  The FONSI, after highlighting the EA's findings

regarding air quality, concluded, "Given the small scale, localized impacts associated

with this project, the understanding of local resource conditions, and an understanding

of the air quality effects, the incremental contribution of this project to existing air quality

conditions is not considered significant."  (FS03897.)  Plaintiffs, among others, appealed

the FONSI.  (FS05738-60.)  On August 4, 2008, the appeal was denied and the FONSI

was upheld.  (FS05778-85.)[8]

On September 2, 2008, the BLM approved the drilling permits for the Project.

(Doc. # 1 at 15, ¶ 68; Doc. # 15 at 14, ¶ 68.)  The record indicates that the BLM relied

on the Forest Service's conclusions in approving the permits.  (FS00261-62; FS03886;

*see also* Doc. # 29 at 8.)[9]

## B.   PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint initiating this action on October 31, 2008.  (Doc.

# 1.)  OXY USA filed an unopposed motion to intervene on December 9, 2008 (Doc.

# 7-8.), which the Court granted (Doc. # 10.).  Both Defendants and OXY USA have

filed Answers to the Complaint.  (Doc. # 11, 15.)  Defendants filed the first portion of the

---

[7] The FONSI was decided by Defendant Mary Morgan, the Forest Supervisor for the Forest at the time.

[8] The appeal was decided by Antoine Dixon, the Deputy Regional Forester at the time.

[9] The surface and subsurface use of National Forest lands are managed by the Forest Service and BLM, respectively.  The Forest Service acted as the lead agency in approving the Project.

administrative record on June 11, 2009 (Doc. # 20), and twice supplemented the record on August 7 and 24, 2009 (Doc. # 23, 25).

On October 2, 2009, Plaintiffs filed their Opening Brief, petitioning for review of the Forest Service and BLM decisions. (Doc. # 28.) Defendants and OXY USA both filed Responses (Doc. # 29, 33), and Plaintiffs filed a Reply (Doc. # 34). Defendants have also filed Objections to Extra-Record Evidence allegedly submitted by Plaintiffs with their Opening Brief (Doc. # 30), to which Plaintiffs filed a Response (Doc. # 35).

## III. <u>ANALYSIS</u>

### A. STANDING

As a foundational matter, OXY USA challenges Plaintiffs' constitutional standing to bring this action. (Doc. # 33 at 6-21.) Even if OXY USA had not done so, "standing is a component of this [C]ourt's jurisdiction, and [the Court is] obliged to consider it sua sponte [if there is a question as to standing] to ensure the existence of an Article III case or controversy." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009). As the party invoking federal jurisdiction, Plaintiffs bear the burden of demonstrating their standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs are environmental organizations bringing this action on their own behalf and on behalf of their members. (Doc. # 1 at 4-5, ¶¶ 12-13; Doc. # 28 at 5 n.2.)[10]  They

---

[10]  Although the Complaint does not specifically state that Plaintiff Wilderness Workshop is bringing this action on behalf of its members (Doc. # 1 at 4-5, ¶ 13), Wilderness Workshop does so state in its Opening Brief (Doc. # 28 at 5 n.2), and OXY USA does not challenge the point. Therefore, the Court will construe the Complaint as being brought by both Plaintiffs on their own behalf and on behalf of their members.

have submitted eight declarations for purposes of establishing standing.[11]  An

environmental organization has standing if "its members would otherwise have standing

to sue in their own right, the interests at stake are germane to the organization's

purpose, and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  As briefed by the parties, the issue

of Plaintiffs' standing turns on the first requirement, namely, whether Plaintiffs' members

would have standing to bring suit on their own.[12]  Plaintiffs must demonstrate three

elements to establish their members' standing:  injury in fact, causation, and

redressability.  *Lujan*, 504 U.S. at 560-61.

_____

[11]  The declarants are members of one or both of the Plaintiff organizations.  Defendants object to this Court's consideration of all but one of these declarations on the grounds that (1) they are not part of the administrative record, (2) they are a "back door" attempt to introduce merits evidence, and (3) they are otherwise inadmissible under the Federal Rules of Evidence. (Doc. # 30 at 3-12.)  Although this Court's review is generally limited to the administrative record, *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001), the Court has an independent responsibility to ensure that Plaintiffs have standing to bring this suit as a jurisdictional matter, *Dias*, 567 F.3d at 1176.  Therefore, the Court will consider the declarations, but solely for the purpose of evaluating Plaintiffs' standing.  *See New Mexico ex rel. Richardson*, 565 F.3d at 696 n.13 (evaluating organizations' member declarations – that were "attached to their opening brief" – in order to evaluate organizations' standing); *NW Envtl. Def. Ctr. v Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997) (same).

[12]  Each Plaintiff need only show that at least one of its members would have standing to bring suit on his/her own.  *See Roe No. 2 v. Ogden*, 253 F.3d 1225, 1230 (10th Cir. 2001).
    As for the second and third requirements, the Court holds that these are met. The interests at stake in this action are germane to Plaintiffs' purpose as environmental organizations.  (*See* Doc. # 28, Ex. 6, ¶ 4; *id.* Ex. 7, ¶ 2.)  *See also New Mexico ex rel. Richardson*, 565 F.3d at 696 n.13.  Also, Plaintiffs seek only declaratory and injunctive relief against Defendants, and Plaintiffs' individual members need not be joined in the action for a court to afford such relief.  (*See* Doc. # 1 at 19-20.)  *See also New Mexico ex rel. Richardson*, 565 F.3d at 696 n.13.

1.    Injury In Fact

"Injury in fact" is defined as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted).  In environmental cases, plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("[A]n individual can establish "injury in fact" by showing . . . that the person's future life will be less enjoyable – that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction – if the area in question remains or becomes environmentally degraded.").

Plaintiffs' members' declarations establish that they have suffered a sufficient injury in fact to confer standing.  Declarant Patricia Breslin declared that she visits the Forest frequently and that "[t]he decline in local air quality is definitely affecting my enjoyment of [the] Forest."  (Doc. # 28, Ex. 1, ¶¶ 8, 11.)  Declarant Todd Pierce is a photographer whose work involves aerial shots of the Forest, and who declared that "[t]he dirtier the sky gets, the more my career is harmed."  (*Id.* Ex. 4, ¶¶ 6, 8.)  Pierce's aesthetic interests are also affected:  "Whereas once I enjoyed pristine vistas of the forest and fresh mountain air, now the sky often looks muddy."  (*Id.,* ¶ 10.)  Declarant Andy Wiessner has been a frequent user of the Forest, and expressed the concern that

> BLM and the Forest Service are leasing and approving development
> without adequately or cumulatively analyzing the overall impact of their
> programs on air quality . . . I do not think it is adequate to analyze oil and
> gas leases . . . on a piecemeal basis.  Almost assuredly, if such a piece-
> meal analysis is done, no adverse impacts on overall air quality will be
> shown.

(*Id.* Ex. 3, ¶¶ 4, 7-8.)  Declarant Julie McCahan expressed concern about the effect of

air pollution on her lungs and health when breathing deeply while cycling, skiing, or

hiking in the area.  (*Id.* Ex. 2, ¶ 11.)  McCahan also expressed concerns regarding

visibility:  "I look out my dining room window and I see smog six out of seven days of the

week . . . Being close to nature brings me tranquility and spiritual refreshment.  Already,

the smog is diminishing my experience."  (*Id.,* ¶¶ 9-10.)  These declarations establish

that Plaintiffs' members "use the affected area and are persons for whom the aesthetic

and recreational values of the area will be lessened by the challenged activity."  *Laidlaw*,

528 U.S. at 183; *see also Pac. Lumber*, 230 F.3d at 1149.

One of OXY USA's primary arguments regarding standing is that Plaintiffs have

not established visibility- or ozone-related injury in fact because the effects of the

Project on visibility and ozone creation are minimal and do not violate applicable

environmental standards.  (Doc. # 33 at 8-12, 14-17, 19-20.)  However, the level of

harm necessary to establish standing is less than that needed to show a violation of

governing environmental standards.  *See LaFleur v. Whitman*, 300 F.3d 256, 270-71

(2d Cir. 2002) (stating that petitioner had standing even if the level of pollution at issue

remained within the NAAQS because one need only show an "identifiable trifle" of injury

to establish standing); *see also Sierra Club, Mineral Policy Ctr. v. El Paso Gold Mines,*

*Inc.*, No. Civ.A.01 PC 2163, 2002 WL 33932715, at *3 (D. Colo. Nov. 15, 2002) (following "identifiable trifle" standard).  The proper focus is on *whether* the plaintiff was harmed, not on the *amount* of harm to the environment.  *Laidlaw*, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.  To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits . . . .").

OXY USA also argues that Plaintiffs' alleged injuries are not sufficiently particularized, but are instead shared by the public generally.  (Doc. # 33 at 12, 15.) The argument is unpersuasive here, where declarants have sufficiently described injuries to their personal aesthetic, recreational and economic interests.  *See Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice [to establish standing].").

The Court holds that Plaintiffs have established a sufficient injury in fact to confer standing.

2.  <u>Causation</u>

Although causation is a closer issue, the Court holds that this element of the standing analysis is also met.  The causation element requires that the injuries suffered by Plaintiffs' members must be "fairly traceable" to Defendants' approval of the Project.

*Lujan*, 504 U.S. at 560; *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1264-65 (10th Cir. 2002).

The EA specifically discusses the individual and cumulative effects of the Project on visibility in several Class I and Class II areas within the Forest, and on emissions of NOx and VOCs (ozone's precursors) in these areas.  (FS03963-72.)  These negatively impacted areas include the Flat Tops Wilderness Area, Eagles Nest Wilderness Area, and Maroon-Bells-Snowmass Widerness Area.  (*See id.*)  Declarant Breslin lives directly below the Flat Tops Wilderness Area within the Forest, and frequently visits that area.  (Doc. # 28, Ex. 1, ¶¶ 7-8.)  Declarant Wiessner lives a short distance from the Eagles Nest Wilderness Area, much of the view from his home is of the Maroon-Bells-Snowmass Widerness Area, and Wiessner has been a frequent user of both areas.  (*Id.* Ex. 3, ¶¶ 1, 4.)  Declarants Todd Pierce and Patricia Batchelder both frequently hike in the Flat Tops Wilderness Area and Eagles Nest Wilderness Area (*id.* Ex. 4, ¶¶ 4, 10; *id.* Ex. 5, ¶ 8), while Declarant Peter Hart frequents the Maroon Bells/Snowmass Wilderness Area (*id.* Ex. 7, ¶ 11).  Because the EA identifies tangible, negative effects of the Project on air quality in these Class I and Class II areas, these declarations establish that the alleged harms discussed *supra* (in the injury in fact section) are "fairly traceable" to the Project.

OXY USA argues that the Project will not sufficiently cause the alleged harms because the impacts of the Project are small compared to emissions from other sources in the area.  However, given the evidence that the Project will cause tangible emissions of NOx and VOCs and will have tangible effects on visibility, the amount of

environmental harm compared to other emissions sources has little relevance for standing purposes.  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.,* 73 F.3d 546, 558 (5th Cir. 1996) ("Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any of Sierra Club's members to trace his injuries to Cedar Point's discharge in particular.  Rather, it is sufficient for Sierra Club to show that Cedar Point's discharge of produced water ***contributes*** to the pollution that impairs Douglas's use of the bay.") (emphasis in original); *Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997) (citing this language from *Cedar Point Oil* in holding that "[p]laintiff's allegations – that defendants' emissions impair its members' ability to breathe clean air and view natural scenery and wildlife – clearly satisfy th[e causation] requirement.").

   3. <u>Redressabilty</u>

  Plaintiffs must also establish that their injury is "likely to be redressed by judicial intervention."  *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d at 1264-65; *see also Lujan*, 504 U.S. at 561 (stating that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision).  A plaintiff "need not show that a favorable decision will relieve his *every* injury," but only that it will relieve a discrete injury.  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).

  OXY USA argues that this Court cannot relieve the alleged injury because the majority of pollution sources in the area are located on non-federal lands and Defendants have no jurisdiction over those sources.  (Doc. # 33 at 13-14, 21.) However, Defendants have jurisdiction over projects on the lands they govern.  The EA

shows that the Project will negatively impact visibility levels in the Forest and that the Project will cause emissions of NOx and VOCs, both ozone precursors.  A ruling by this Court in favor of Plaintiffs would likely impact, even if only to a small extent, visibility and the amount of ozone precursors being emitted.  Thus, the injuries in fact described above would likely be redressed, even if only to a small extent, by a judicial decision in favor of Plaintiffs.

For the foregoing reasons, the Court holds that Plaintiffs have standing to bring this action.

## B.      MERITS

Plaintiffs allege that Defendants' actions violated the National Environmental Policy Act ("NEPA"), National Forest Management Act ("NFMA"), and Federal Land Policy and Management Act ("FLPMA").  (*See* Doc. # 1 at 15-19; Doc. # 28 at 12-36.)[13] Plaintiffs raise three general arguments for why Defendants' decisions should be overturned.  First, Plaintiffs argue that the Forest Service violated NEPA and NFMA by failing to consider the Project's effects on the creation of ozone.  (Doc. # 28 at 12-27.) Second, Plaintiffs argue that the Forest Service violated NFMA because, as the Forest Service's own analysis indicates, the Project's effects will violate governing air visibility standards.  (*Id.* at 27-34.)  Third, Plaintiffs argue that the BLM violated NEPA and

---

[13]  NFMA governs Forest Service decisions regarding surface use of National Forest lands, whereas FLPMA governs BLM decisions regarding subsurface use of National Forest lands.  *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 585 (1987).
Plaintiffs also allege that Defendants violated the Clean Air Act ("CAA"), but only in the broader context of Defendants' alleged violations of NEPA, NFMA, and FLPMA.  (*See* Doc. # 28 at 12-36.)

FLPMA for the same reasons:  failure to consider ozone and failure to deny the permits

given the Forest Service's conclusions regarding visibility impacts.  (*Id.* at 12-22, 34-36.)

      1.    <u>Standard of Review, Scope of Review, and Burden of Proof</u>

      Under the APA, a reviewing court shall set aside agency action if it is, *inter alia*,

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).  Generally, an agency decision will be considered arbitrary and

capricious

> if the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).  A reviewing court should engage in a "thorough, probing, in-depth

review," *Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation

omitted), with its review "generally limited to . . . the administrative record," *Garvey*, 256

F.3d at 1027 n.1.[14]

      However, "[t]he scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency."  *Motor

Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Davis v. Mineta*, 302 F.3d 1104, 1111

---

[14]  Plaintiffs have attached 27 exhibits to their Opening Brief.  Defendants have objected, arguing that the exhibits should not be considered by the Court.  The Court has already ruled that it will consider Exhibits 1 through 8 (Plaintiffs' member declarations) for purposes of evaluating Plaintiffs' standing.  Twelve other exhibits submitted by Plaintiffs are merely excerpts from the administrative record.  (*see* Doc. # 28, Exs. 11-13, 15-21, 26-27.)  As for the other seven exhibits, the Court declines to consider them, either because they are improper subjects for judicial notice or because the Court finds it unnecessary to consider them.

(10th Cir. 2002) (stating that the court's review is "highly deferential").  The Court

confines its review "to ascertaining whether the agency examined the relevant data and

articulated a satisfactory explanation for its decision, including a rational connection

between the facts found and the decision made." *Colorado Wild v. U.S. Forest Serv.*,

435 F.3d 1204, 1213 (10th Cir. 2006).  "Deference to the agency is especially strong

where the challenged decisions involve technical or scientific matters within the

agency's area of expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739

(10th Cir. 2006).

"[T]he burden of proof rests with the appellants who challenge [the agency]

action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176

(10th Cir. 2008) (citation and internal quotation marks omitted).

  2. <u>Plaintiffs Argue that the Forest Service Violated NEPA and NFMA by
Failing to Consider the Project's Effects on Ozone</u>

Plaintiffs argue that the Forest Service's alleged failure to consider the Project's

effects on ozone creation violated both NEPA and NFMA.  NEPA is a procedural statute

(setting procedural limitations on agency action) whereas NFMA sets substantive

restrictions on agency action. *See Colo. Off-Highway Vehicle Coal. v. United States*,

505 F. Supp. 2d 808, 820 (D. Colo. 2007).  However, Plaintiffs' NEPA and NFMA claims

against the Forest Service are interrelated.  (*See, e.g.*, Doc. # 28 at 23 ("[T]he agency

did not analyze ozone at all [in violation of NEPA].  Lacking any analysis of ozone, the

agency cannot support its conclusion that the ozone standard will be met [under

NFMA].").  Therefore, to some extent, the Court will consider the two claims in tandem.

16

a)      *Overview of NEPA*

NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action." *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1162 (10th Cir. 2002). "NEPA does not, however, require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Krueger*, 513 F.3d at 1178 (citation and internal quotation marks omitted). Also, "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct." *Russell*, 518 F.3d at 821. NEPA merely guards against "uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

> In conducting this analysis [under NEPA], the [agency] must prepare one of the following: (1) an environmental impact statement, (2) an environmental assessment, or (3) a categorical exclusion. An environmental impact statement involves the most rigorous analysis, and is required if a proposed action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.
>
> If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed environmental assessment. 40 C.F.R. § 1508.9. An environmental assessment provides "sufficient evidence and analysis" to determine whether a proposed project will create a significant effect on the environment. *Id.* If so, the agency must then develop an environmental impact statement; if not, the environmental assessment results in a "Finding of No Significant Impact," and no further agency action is required. *Id.*

*Bosworth*, 443 F.3d at 736.

       *b)*    *Overview of NFMA*

"NFMA establishes a two-step process for forest planning.  First, the Forest Service prepares a forest plan."  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006) (citation and internal quotations omitted); *see also* 16 U.S.C. § 1604(a) (providing that the Forest Service shall "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System.").  A forest plan is designed to create "general, forest-wide planning goals."  *Bosworth*, 443 F.3d at 737.  "Second, the Forest Service is required to implement the forest plan by approving or disapproving specific projects.  Projects must be consistent with the governing forest plan . . . ."  *Silverton Snowmobile Club*, 433 F.3d at 785 (citation and internal quotations omitted); *see also* 16 U.S.C. § 1604(i) (providing that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans").

The governing Forest Plan here consisted of a "Land and Resource Management Plan – 2002 Revision" and "Air Resource Management Plan."  (*See* FS09149-457; FS05156-297; *see also* Doc. # 28, at 22.)  The Forest Plan contains "Forest-wide Standards and Guidelines" that govern all projects within the Forest's borders.  A "standard" is defined as a "course of action that must be followed, or a level of attainment that must be reached . . . .  Adherence to standards is mandatory." (FS09188.)  On the other hand, a "guideline" under the Forest Plan is solely a "preferred or advisable course of action or level of attainment."  (*Id.*)  One particular standard

required by the Forest Plan is that land managers must "[m]eet state and federal air quality standards and comply with local, state, and federal air quality regulations and requirements either through original project design or through mitigation for such activities as . . . oil and gas exploration and production."  (FS09190.)

        c)    *Analysis*

It is undisputed that the Forest Service did not undertake a quantitative analysis specifically analyzing ozone in the EA.  In discussing ozone, the EA merely listed ozone as a "criteria pollutant" under the NAAQS (FS03958), and stated that "[e]levated concentrations of [NOx and VOCs] can . . . contribute to the formation of ground level ozone" (FS03956).  Aside from these two statements, the EA does not specifically discuss ozone further.  Plaintiffs argue that this brief discussion does not constitute the "hard look" at environmental impacts that NEPA requires, and does not comply with the Forest Service's obligations to protect air quality under NFMA and the governing Forest Plan.

The record does indicate, however, that the Forest Service conducted modeling that involved project-level and cumulative analysis on one of ozone's precursors, NOx. (FS03968-72.)  The EA also estimated the Project's effects on the emission of VOCs, ozone's other precursor.  (FS03963-65.)[15]  Further, the administrative record supports

---

[15]  The Forest Service's analysis here does not appear to have gone as far as the analysis of NOx and ozone conducted by federal agencies in *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997 (S.D. Cal. 2003).  There, the court stated,
> [D]efendants present a reasoned analysis of the impacts on ozone.  They provide a logical argument that the presence of NOx and ozone will be closely and positively correlated.  They then analyzed the contributions of all turbines at issue to the concentration of NOx at the U.S. border and reasonably extrapolated from this the impact on ozone.  The criticism leveled by plaintiff is not at the amount of

Defendants' argument that the Forest Service decided not to model ozone because modeling ozone at the project level is extremely complex and resource intensive due to ozone's regional nature.  (Doc. # 29 at 22, 25.)  Specifically, in the Forest Service's Response to Public Comment, it stated, "Simulation of ozone formation and transport is a highly complex and resource intensive exercise that is beyond the scope of this EA and is left to agencies with jurisdiction over areas with ozone problems."  (FS00406.) When planning the air modeling for the Project, Forest Service officials advised that "[t]he NEPA document should discuss ozone in the narrative, however comprehensive regional ozone modeling is not recommended for this NEPA document."  (FS01673.)

Defendants' conclusion that ozone modeling was inappropriate for this Project based on its complexity and cost is entitled to deference.  *See TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863-64 (D.C. Cir. 2006) (upholding agency action where EA found that a "meaningful evaluation of [ozone] on a project-by-project basis is not practical"); *N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 694 (M.D.N.C. 2001) (deferring to agency expertise and recognizing agencies' documented position that ozone analysis on the project level would provide little benefit).  Although ozone modeling may have been possible, it is not

------

data collected to determine NOx levels at the border, but rather at the methodology employed to estimate ozone impacts.  NEPA does not provide the Court with authority, however, to disagree with the agencies' specialized knowledge and determination that the particular methodology urged by plaintiffs would be infeasible and inaccurate.  Accordingly, the Court does not find that the agencies acted arbitrarily in issuing the FONSIs because of uncertainty.

*Id.* at 1022.  Although the Forest Service does not appear to have explicitly conducted such an "extrapolation" of the impact of NOx on ozone, the same principles and reasoning expressed by the court in *Border Power Plant* apply in this case.

the role of this Court to direct the Forest Service to engage in any particular scientific investigation or to utilize any particular technology in its NEPA analysis. *See Krueger*, 513 F.3d at 1179 ("NEPA's 'hard look' does not necessarily require the agency to develop 'hard data.'").  The Court, therefore, cannot conclude that the Forest Service acted arbitrarily and capriciously in violation of NEPA by failing to conduct a regional ozone modeling analysis for the Project.

Given this conclusion, the Court also concludes that the Forest Service's decision was not arbitrary and capricious in violation of NFMA.  The Forest Service's analysis of NOx and VOCs did not indicate a violation of applicable air quality standards.  Although Defendants concede that the Forest Service had an obligation under the Forest Plan to meet NAAQS (with ozone being one of those NAAQS) (*see* Doc. # 29 at 27), the Forest Service's analyses did not reveal any violation of NAAQS. It certainly appears that quantitative ozone modeling would have been the *most effective* way to ensure the Project's compliance with the ozone NAAQS.  However, the Court is not in a position to conclude, in the particular circumstances of this case, that the Forest Service's methodology was insufficient in terms of determining compliance with NAAQS.  Therefore, the Court concludes that the Forest Service decision was not inconsistent with the governing Forest Plan, and therefore did not violate NFMA.  *See Silverton Snowmobile Club*, 433 F.3d at 785; 16 U.S.C. § 1604(i).

However, the record suggests that updated regional ozone modeling in this area may be necessary currently or in the near future.  The record indicates that the Forest Service partnered with the Garfield County Public Health Department in the summer of

2006 on a regional ozone monitoring project in this area.  (*See* FS06727.)  "The data

showed that current ozone concentrations across the region are below the [NAAQS] but

that some areas are nearing levels of concern."  (*Id.*)  In 2007, an air modeling team –

which included Forest Service and BLM officials – developed a "Modeling Protocol for

Oil and Gas Development in the Intermountain Region."  (FS01700-05.)  The team

noted that ozone is a "key pollutant[] of concern" in the intermountain region and a

"pollutant of growing importance in the rural west."  (FS01700-02.)  In addition, during a

Forest Service meeting regarding this particular Project, participants considered the

possibility of conducting an "[o]verarching regional oil and gas air quality assessment –

[an] umbrella document for EAs."  (FS05675; *see also* FS01672; FS01701; FS05672.)[16]

Without such an umbrella document, the Forest Service may repeatedly find it

impractical to conduct quantitative ozone modeling when faced with individual proposed

projects.  Although in this case the Court defers to agency expertise not to conduct a

quantitative ozone analysis, the Court anticipates that future similar appeals may meet

with more success if such an umbrella assessment is not conducted (either by the

Forest Service acting alone, by the Forest Service acting in collaboration with other

governmental entities, or by other governmental entities acting without Forest Service

input).

---

[16]  The Forest Service has this option of "tiering" in order to avoid resource-intensive
duplication while still complying with NEPA requirements.  *See* 40 C.F.R. §§ 1502.20, 1508.28;
36 C.F.R. §§ 228.102(e), 228.107(a).

The Court holds that the Agency did not act arbitrarily and capriciously in violation of NEPA or NFMA in declining to conduct quantitative ozone modeling in response to this particular proposed Project.

3.     Plaintiffs Argue that the Forest Service Violated NFMA Because the Project's Effects Will Violate Governing Air Visibility Standards

Plaintiffs also argue that the Forest Service acted arbitrarily and capriciously in violation of NFMA by approving the Project, despite finding that cumulative visibility impairment would greatly exceed governing visibility standards.  (Doc. # 28 at 27-34.) The governing Forest Plan contains an objective to "[p]rotect the air quality related values ["AQRVs"] within Class I areas."  (FS05171.)  Visibility is one such AQRV. (FS05173.)  Although the parties dispute whether the law *requires* the Forest Service to protect visibility (in particular, 42 U.S.C. § 4745(d)(2)(B)), Defendants concede that the Forest Service has "voluntarily recognized an obligation to protect air quality, including visibility, from all activities occurring under the [Forest Plan]."  (Doc. # 29 at 30.)

The EA contains extensive project-level and cumulative visibility analyses. (FS03959-72.)  Visibility effects were assessed based on projected changes in "deciviews" and whether these changes would exceed limits of acceptable change ("LACs").  (FS03959-60.)  The Forest Service identified two separate LACs:  an LAC of 0.5 deciviews for the individual Project and an LAC for cumulative effects at 1.0 deciview.  (FS03959-60.)  The EA's modeling indicated that the Project would not cause visibility impairment in any Class I or Class II area above 0.5 deciviews (the maximum found in any one area was 0.33).  (FS03967; *see also* FS03972 ("Individually the

[Project] would not result in an exceedance of . . . Class I visibility thresholds.").)

However, the EA's cumulative impacts analyses indicated deciview changes

significantly exceeding 1.0 deciviews in every Class I and Class II area analyzed.

(FS03970; *see also* FS03972 ("[The cumulative modeling] indicates substantial adverse

air quality effects to Class I/II areas collectively from [various] sources.").)

The only LAC guideline contained within the governing Forest Plan is a guideline

of 0.5 for specific projects, and this guideline is only a "preferred or advisable" level of

attainment.  (FS09190; FS09188.)  The Forest Service's analysis indicates that this LAC

would not be exceeded by the Project.  (FS03967.)  However, it is important to note that

the Forest Plan does not contain any specified LAC for cumulative visibility impacts.

Thus, the Forest Service's conclusion in the EA that cumulative visibility effects would

exceed the voluntarily set figure of 1.0 deciviews does not by itself make approval of the

Project inconsistent with the Forest Plan.  See *Silverton Snowmobile Club*, 433 F.3d at

785 (requiring agency decisions to be consistent with the governing forest plan); 16

U.S.C. § 1604(I) (same).

Importantly, the Forest Service's analysis concluded that, although the

cumulative effects analysis included some effects from oil and gas exploration, the

primary cause of visibility problems were "due to emissions from power plants."

(FS03972.)  Also, the cumulative effects analysis considered both "current and future

emissions" from these sources.  (*Id.*)  Thus, the FONSI concluded, "Given the small

scale, localized impacts associated with this project, the understanding of local resource

conditions, and an understanding of the air quality effects, the incremental contribution

24

of this project to existing air quality conditions is not considered significant." (FS03897.)

However, the Forest Service also discussed a plan for addressing the more general

problem of cumulative visibility impacts in the area:

> The results of this [analysis] underscore the importance of interagency
> cooperation in mitigating substantial air quality effects from current and
> future emission sources.  The Colorado APCD has the authority and
> responsibility to manage and control existing air pollution sources.  The
> Forest Service is working with the APCD through the Regional Haze State
> Implementation Process (SIP) to manage and protect air quality in Class I
> areas.

(FS03972.)  The SIP, developed in 2008 and 2009, and updated in January 2011, is

designed to attain several regional goals relating to visibility levels in wilderness areas

of the Forest.  *See* htttp://www.cdphe.state.co.us/ap/regionalhaze.html (last visited July

27, 2011).[17]  The updated plan indicates that the Forest Service has been actively

involved with SIP.  (*See id.*)

The Court's role here is limited to determining whether Defendants acted

arbitrarily and capriciously; it may not substitute its own judgment for that of the Forest

Service.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  After documenting the adverse

impacts to visibility in the EA, the Forest Service determined that its comprehensive

efforts with the APCD under the Regional Haze SIP were sufficient measures to meet

its obligation to "manage and protect air quality in Class I areas."  (FS03972.)  *See also*

*San Juan Citizens Alliance v. Stiles*, No. 08-cv-00144, 2010 WL 1780816 at *6-7, 21 (D.

---

[17]  *See also* Fed. R. Evid. 201(b) (stating that judicial notice may be taken of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

Colo., May 3, 2010) (declining to require literal compliance with Forest Plan guideline and discussing role of EPA and CDPHE in Clean Air Act enforcement).  The Forest Service, therefore, sufficiently "examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made."  *Colorado Wild*, 435 F.3d at 1213.  This is all the APA requires.

      4.    <u>Plaintiffs Argue that the BLM Violated NEPA and FLPMA for the Same Reasons</u>

Plaintiffs argue that the BLM violated NEPA and FLPMA for the same reasons, namely, failing to consider the Project's effects on ozone and visibility.  The record indicates that the BLM, in approving the drilling permits for the Project, relied entirely on the Forest Service's environmental assessment.  Plaintiffs have conceded that, if the Court concludes that the Forest Service's actions complied with applicable law, then it would necessarily follow that the BLM's decisions also complied with applicable law. (*See, e.g.*, Doc. # 34 at 16 ("Plaintiffs agree that BLM can rely on analysis performed by the Forest Service if that analysis is legally sufficient.").  The record and the governing statutes also support this conclusion, namely, that the Court's analysis regarding whether the BLM violated NEPA and FLPMA is effectively the same as its analysis with respect to whether the Forest Service violated NEPA and NFMA.[18]  Therefore, because

---

[18]  The Forest Service's obligations under NEPA and the BLM's obligations under NEPA are the same.

In terms of NFMA and FLPMA, the Forest Service's obligations under NFMA and the BLM's obligations under FLPMA are effectively the same.  Similarly to the Forest Service's obligations under NFMA, the BLM (under FLPMA) must develop resource management plans ("RMPs") for public lands under its management.  *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709, 712 (10th Cir. 2010).  An RMP is "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses."  43 C.F.R. § 1601.0-2.  "FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs."  *Utah Shared Access Alliance v.*

the Court has already concluded that the Forest Service's decision was not arbitrary

and capricious under NEPA and NFMA, the Court similarly concludes that the BLM's

decision was not arbitrary and capricious under NEPA and FLPMA.

### IV.  CONCLUSION

Based on the foregoing, IT IS ORDERED THAT the final decisions of the Forest

Service and BLM are AFFIRMED.  The Clerk of Court shall enter judgment in favor of

Defendants and Intervenor-Defendant.  Defendants and Intervenor-Defendant shall be

awarded their costs under Fed. R. Civ. P. 54(d)(1).  The parties are to bear their own

attorneys' fees.

August   05  , 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

*Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006); *see also* 43 U.S.C. § 1732(a); 43 C.F.R.
§ 1610.5-3.  The RMP requires BLM decisions to comply with air quality regulations.  *See also*
43 U.S.C. § 1701(a)(8); 43 C.F.R. § 2920.7(b)(3).  These obligations of the BLM under FLPMA
are equivalent to the Forest Service's obligations under NFMA.